Bobby J. GLASS, Carol Rose (Individually and as Trustee of the Walter Lewis Rose, III Estate Trust), Gary D. Stillwell, and Stephen D. Strickland, Plaintiffs–Appellees,

and

Federal Deposit Insurance Corporation, Plaintiff–Appellee,

v.

UNITED STATES, Defendant–Appellant.

No. 00–5137.

United States Court of Appeals, Federal Circuit.

July 24, 2001.

Peter J. Broullire, III, of Albuquerque, NM, argued for plaintiffs-appellees.

John V. Thomas, Associate General Counsel, Federal Deposit Insurance Corporation, of Washington, DC, argued for plaintiff-appellee. With him on the brief were David L. Creskoff, Tina A. Lamoreaux, Stephen C. Zachary, and John F. Elmore, Attorneys.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were David M. Cohen, Director; Katherine M. Kelly, Kenneth M. Dintzer, Michael M. Duclos, William G. Kanellis, and Kenneth Kulak, Trial Attorneys. Of counsel was Mark A. Melnick, Assistant Director.

Before MICHEL, Circuit Judge, ARCHER, Senior Circuit Judge, and SCHALL, Circuit Judge.

ARCHER, Senior Circuit Judge.

The United States appeals from the judgment of the United States Court of Federal Claims finding it liable for breach of contract and awarding damages of $3.972 million to plaintiff shareholders Bobby J. Glass et al. ("shareholders") and $2.1 million to plaintiff intervenor Federal Deposit Insurance Corporation ("FDIC"). *Glass v. United States*, 47 Fed. Cl. 316 (2000). We conclude that the court erred in holding that the shareholders were third party beneficiaries of an implied-in-fact contract and erred in holding under the facts of this case that the FDIC had standing to intervene. Accordingly, the judgment of the Court of Federal Claims is reversed-in-part and vacated-in-part and remanded for proceedings consistent with this opinion.

## BACKGROUND

This case is one of more than 120 *Winstar*-related cases, *see United States v.*

*Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and is one of the five test cases that the Court of Federal Claims selected to consider the common issues in these numerous related cases. We have previously reviewed two of these test cases, *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir. 2001), and *California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir. 2001).

The *Winstar*-related cases have their origin in the thrift crisis of the early 1980's. The history behind this crisis and the subsequent enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat. 183, in 1989 have been thoroughly discussed in our opinions in *Glendale* and *California Federal, supra,* and in the original *Winstar* cases. *Winstar Corp.*, 518 U.S. at 843–58, 116 S.Ct. 2432. This background will be discussed below only as it specifically relates to the facts of this case.

The shareholders were the principal stockholders in Sentry Mortgage Corporation, a company engaged in the manufactured home (mobile home) lending business. On December 16, 1985, the shareholders caused Sentry to enter into a "reverse-purchase" agreement with Security Savings Bank whereby Sentry was to contribute all of its non-cash assets to Security Savings in exchange for a controlling interest in Security Savings' stock. Under this agreement, Sentry would dissolve following the contribution of its assets and the Security Savings stock would be transferred to Sentry's shareholders. The agreement was also conditioned on obtaining certain regulatory forbearances from the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB").[1]

At the time of this proposed transaction, there was a widespread crisis in the savings and loan industry, and many thrifts were in financial trouble and subject to seizure and liquidation by government regulators. The government insurance fund, however, lacked sufficient funds to liquidate even a small percentage of the insolvent thrifts. Security Savings was one such insolvent thrift, and the FHLBB and FSLIC, which considered Security Savings a supervisory case, were seeking a solution to Security Savings' dire financial situation. Sentry's proposed purchase of Security Savings, and the resulting recapitalization and infusion of Sentry's non-liquid assets into Security Savings, provided the solution.

In exchange for relieving the FHLBB and FSLIC of this supervisory case, Sentry sought favorable regulatory treatment. During this time period, the FHLBB and FSLIC were encouraging mergers between healthy banks and failing thrifts, and would typically offer certain regulatory forbearances in order to encourage such mergers. One such forebearance was called "supervisory goodwill." Supervisory goodwill was an accounting device that permitted the acquired thrift to record as an asset on its books a certain dollar amount for goodwill.[2] This intangible asset, which assisted in satisfying regulatory

---

**1.** The FSLIC was an agency under the FHLBB that formerly insured thrift deposits and acted to regulate all federally insured thrifts. *Winstar Corp. v. United States*, 64 F.3d 1531, 1535 (Fed.Cir.1995); 12 U.S.C. § 1725 (1989).

**2.** In the case of a failing thrift, the liabilities were, in general, larger than the assets, giving

capital requirements, was gradually written off as a business expense over a period of 25–40 years. Typically, this amount would be the difference between the value of the acquired thrift's net liabilities and the acquired thrift's net assets. Among other requested forbearances, Sentry sought approval of supervisory goodwill by the FHLBB and FSLIC in connection with its proposed purchase of Security Savings.

After an extended period of negotiation, the FHLBB and FSLIC approved Sentry's acquisition of Security Savings in the manner described, and allowed the recapitalized Security Savings to record approximately $6 million in supervisory goodwill capital. Security Savings proceeded to amortize this goodwill on a 25–year, straight-line basis, as outlined in its business plan.

In August 1989, Congress enacted the Financial Institutions Recovery, Reform and Enforcement Act ("FIRREA"). Pub.L. No. 101–73, 103 Stat. 183 (1989). FIRREA imposed new regulatory capital requirements on thrifts and, as a result, Security Savings was severely restricted in its use of goodwill capital to meet capital requirements. Security Savings immediately fell out of regulatory compliance and was thereafter, in May 1990, seized by the Office of Thrift Supervision ("OTS") and placed into a receivership directed by the Resolution Trust Corporation ("RTC").[3] Security Savings was eventually liquidated and all its remaining assets, including its

breach of contract claims, now reside in the FSLIC Resolution Fund–RTC ("FRF–RTC"), which is managed by the FDIC. *See Glass,* 44 Fed.Cl. at 81.

On June 25, 1992, the shareholders filed suit against the United States in the Court of Federal Claims, asserting breach of contract and 5th Amendment takings claims. The shareholders contended that FIRREA breached a contract with the government allowing Security Savings to record goodwill capital and to use this intangible asset to meet its regulatory capital requirements. On March 14, 1997, the FDIC filed a complaint in intervention, asserting claims as successor in interest to Security Savings.

On June 15, 1999, Chief Judge Smith of the Court of Federal Claims issued an opinion deciding the parties' cross motions for summary judgment and the United States' motion to dismiss. *Glass v. United States,* 44 Fed.Cl. 73 (1999). He held that the documentary evidence and the conduct of the parties established that Sentry and Security Savings had entered into a contract implied-in-fact with the FSLIC and FHLBB to amortize goodwill over a 25–year period and to use this goodwill for meeting regulatory capital requirements. He further held that FIRREA breached this contract.

Chief Judge Smith then considered the United States' motion to dismiss the FDIC for lack of standing. The United States asserted that any recovery by the FDIC

---

it a negative net worth and making it unattractive to purchasers.

**3.** FIRREA abolished both the FHLBB and FSLIC and distributed their former duties among four different agencies, the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS"), the Federal Housing Finance Board ("FHFB") and

the Resolution Trust Corporation ("RTC"). The OTS took over the role of regulating thrifts and the RTC was responsible for liquidating thrifts that failed during the period of 1989–1995. *See* H.R. Rep. No. 101–222 at 393–4 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 433.

would only be used to satisfy outstanding liabilities of the federal government incurred in liquidating Security Savings. Thus, any recovery would actually flow from the United States Treasury to the United States Treasury. The United States argued that this situation rendered the controversy non-justiciable. Chief Judge Smith denied this motion. He determined that the FDIC was acting as a receiver in this case and was bringing its claim on behalf of the failed thrift, Security Savings, not on behalf of the United States. He concluded that this distinction rendered the FDIC's claim justiciable.

Chief Judge Smith . then referred the case to Senior Judge Margolis for a determination of damages. Judge Margolis, after an eight-day trial, issued final judgment assessing damages against the United States and in favor of the shareholders and the FDIC. *Glass v. United States,* 47 Fed.Cl. 316 (2000). Judge Margolis applied Chief Judge Smith's holding that the shareholders were not parties to the contract between Sentry and Security Savings and the FHLBB, but that they were third party beneficiaries of the contract. He awarded the shareholders their initial investment of the assets in Sentry, which he valued at $3.9 million. He also awarded costs associated with the transaction. He also awarded damages to the FDIC, finding that it was entitled to damages equivalent to the value of the goodwill capital destroyed by the United States' breach of the contract. He valued the approximately $6 million in goodwill capital recorded on Security Savings' books at $2.1 million and awarded this amount to the FDIC.

## DISCUSSION

The United States raises numerous arguments contesting the decisions of the Court of Federal Claims. Among these arguments, the United States challenges the standing of the shareholders as third party beneficiaries of the contract and the standing of the FDIC to bring what the United States argues is a non-justiciable claim. These issues are dispositive to this appeal and therefore we do not reach the other arguments advanced by the United States. We conclude that the shareholders are not third party beneficiaries and that the FDIC's claim does not present a justiciable case or controversy.

### I.  *Shareholders' Third–Party Beneficiary Claim*

■ The Court of Federal Claims' determination of breach of contract liability was rendered on summary judgment. We review a grant of summary judgment by the Court of Federal Claims de novo. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The underlying question of whether the shareholders are third party beneficiaries to the alleged contract is a mixed question of law and fact, but the appropriate test for third party beneficiary status is a question of law that we review de novo. *Cf. Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998); Restatement (Second) of Contracts § 212(2).

The parties disagree over the appropriate test for determining third party beneficiary status. The United States argues that the contract must express the intent of the parties to benefit directly the third party. Specifically, in order to make a shareholder a third party beneficiary, the contract must express the intent of the

promissor to benefit the shareholder personally, independently of his or her status as shareholder. Because the shareholders only stood to benefit under the contract through their ownership interest in Sentry (and later Security), the United States argues that the shareholders are not third party beneficiaries. In response, the shareholders rely on *Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997), and argue that the intent of the parties to the contract alone was sufficient to make them third party beneficiaries. The shareholders contend the FSLIC and FHLBB understood that the shareholders were the true party in interest in the transaction, and the sole purpose of the agreement was to induce them to invest certain of Sentry's assets in Security Savings. Accordingly, the shareholders argue they should have the right to enforce the contract against the United States. They do not argue, however, that they were to benefit directly under the alleged contract.

■■■■ We agree with the United States that the shareholders are not third party beneficiaries to any contract between the FSLIC and FHLBB and Sentry and Security.[4] In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly. Third party beneficiary status is an "exceptional privilege" and, to avail oneself of this exceptional privilege, a party must "at least show that [the contract] was intended for his *direct* benefit." *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S.

220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912) (emphasis added); *see also* Restatement (Second) of Contracts § 302, Illustration 2 (distinguishing between a direct beneficiary and an indirect beneficiary, who is, at most, an incidental beneficiary with no rights to enforce the contract). Our predecessor court has also limited third party beneficiary claims to direct beneficiaries under a contract, and did so in a case that was factually similar to the present case. In *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 697–98 (1980), the Court of Claims considered whether shareholders had valid third party beneficiary claims stemming from a contract entered into by the corporation. The court found that the shareholders did not allege any basis upon which any benefit was owed to them individually, aside from their status as shareholders. The court therefore concluded that they had no viable third party claims. *Id.; see also David Schuerman v. United States*, 30 Fed.Cl. 420, 433 (1994) (reviewing Court of Claims third party beneficiary cases and noting that "[t]he court carefully must distinguish between incidental and indirect beneficiaries and direct beneficiaries, only the latter of which qualify for third-party beneficiary status.").

Our decision in *Montana*, cited by the shareholders, does not alter this analysis. In *Montana*, we agreed with the Court of Federal Claims that the proper test for third party beneficiary status did not require that the contract give the third party the direct right to compensation or the power to enforce that right against the promisor. *Montana*, 124 F.3d at 1273. We did not, however, address the requirement that the contract must directly bene-

---

4. The United States also challenges the Court of Federal Claims determination that there was a contract. Because we ultimately conclude that neither the shareholders nor the FDIC have valid claims based on the facts alleged, we do not address the United States' challenge to the validity of the alleged contract.

fit the third party. Therefore, the law restricting third party beneficiary status remained unchanged by our decision in *Montana*. Accord *Roedler v. Dept. of Energy*, 255 F.3d 1347 (Fed.Cir.2001).

Accordingly, because the shareholders did not stand to directly benefit under the contract, they are at most incidental beneficiaries of the contract with no rights to enforce the contract against the United States. We reverse the Court of Federal Claims summary judgment of liability in favor of the shareholders and remand the case so that the court may consider any remaining claims asserted by the shareholders.

## II. *FDIC's Breach of Contract Claims*

We review the Court of Federal Claims' legal conclusion that the FDIC has asserted a justiciable claim de novo. *See Alger v. United States*, 741 F.2d 391, 393 (Fed.Cir.1984) (holding that we review legal conclusions of the Court of Federal Claims de novo). Article III, section 2 of the United States Constitution limits judicial power to the resolution of actual "cases" or "controversies." In order for the FDIC's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect "the legal relations of parties having adverse legal interests." *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In the present case, the case-or-controversy requirement has not been satisfied.

The justiciability problem in this case is similar to that in *Landmark Land Co., Inc. v. United States*, No. 00–5065, –5073, –5074 (Fed. Cir. argued May 8, 2001), which is being issued concurrently with this opinion. Any award to the FDIC will essentially flow from one government fund to another, from the FRF–FSLIC to the FRF–RTC.[5] The FDIC contends it is asserting the FRF–RTC's claim on behalf of Security Savings, that is, as the successor in interest to Security Savings' assets and liabilities.[6] Accordingly, the FRF–RTC will receive the benefit of any judgment in favor of the FDIC on its breach of contract claim. Any damages paid by the United States to satisfy the FDIC's breach of contract claim, however, will also come from the FRF, specifically, from the FRF–FSLIC. Because the FSLIC was a party to the contract with Security, the damages claim is an FSLIC liability for which the FRF–FSLIC is responsible. 12 U.S.C. § 1821a(d); *Far West Fed. Bank v. OTS*, 930 F.2d 883, 889–90 (Fed.Cir.1991); *RTC v. FDIC*, 25 F.3d 1493, 1505–06 (10th Cir. 1994).

The FDIC contends that any damages award will be distributed to the creditors of Security Savings, and this, the FDIC argues, renders its claim justiciable. We disagree. While any net recovery by the FDIC would be distributed to creditors under the statutory scheme applicable to the Security receivership, FRF–RTC has

---

**5.** The FSLIC Resolution Fund ("FRF") was first established to receive the assets and liabilities of the FSLIC when the FSLIC was abolished under FIRREA. 12 U.S.C. § 1821a (1994). When the RTC was dissolved in 1995, its assets and liabilities were also transferred to the FRF, but the FDIC, the manager of the FRF, has maintained these two sets of assets and liabilities as segregated funds within the FRF, as the FRF–FSLIC and the FRF–

RTC. 12 U.S.C. § 1441a(m); 61 Fed. Reg. 45970, 45971–73 (Aug. 30, 1996).

**6.** The parties do not dispute that the assets of Security Savings, including any legal claims, are now in the possession of the FRF–RTC, which is managed by the FDIC. The complicated series of transactions that passed these claims from Security Savings to FRF–RTC are outlined in the opinion of the Court of Federal Claims. *Glass*, 44 Fed.Cl. at 81.

priority over all other creditors under this statutory scheme. 12 U.S.C. § 1821(d)(11). As subrogee to the claims of Security's depositors, the FRF–RTC has a claim of over $15 million against the Security receivership. Therefore, unless the FDIC recovers over $15 million in damages, any recovery will simply revert to the FRF–RTC. The FDIC has no plausible claim for such a large recovery in damages. Therefore, any damages award to the FDIC will flow from FRF–FSLIC to FRF–RTC.

For the reasons more fully set out in *Landmark*, under the facts presented in this case the FDIC has not asserted a justiciable claim. The FDIC has not demonstrated how the transfer of money from one government fund to another creates a justiciable controversy. Moreover, as in *Landmark*, the fact that the FDIC is a party in intervention does not change our conclusion. Even if the shareholders retain some viable claim on remand, any such claim would be distinct from that advanced by the FDIC and could be fully addressed without regard for the FDIC's claim.

We vacate the summary judgment of the Court of Federal Claims addressing the FDIC's claim and remand this matter so that the Court of Federal Claims can dismiss the FDIC as a party in intervention.

## CONCLUSION

We reverse the summary judgment of liability with respect to the shareholders' contract claims and remand the case so that the court may consider any remaining claims asserted by the shareholders. We vacate the summary judgment with respect to the FDIC's claims and remand with instructions to dismiss the FDIC as a party in intervention.

## COSTS

Each party shall bear its own costs.

*REVERSED–IN–PART, VACATED–IN–PART,* AND *REMANDED.*